UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                              )
STARBRANDS CAPITAL LLC,                       )
d/b/a NORCAL HEALTH CARE                       )
SERVICES,                                      )
                                              )
                    Plaintiff,                )
                                              )
v.                                            )          Civil Case No. 14-12270-ADB
                                              )
ORIGINAL MW INC.,                             )
                                              )
                    Defendant.                )
_____)

**REPORT AND RECOMMENDATION ON THE
PARTIES' CROSS MOTIONS FOR SUMMARY JUDGMENT**

[Dkt. Nos. 98, 102]

February 27, 2017

Boal, M.J.

Plaintiff Starbrands Capital LLC d/b/a Norcal Health Care Services ("Starbrands") brings

this action against defendant Original MW Inc. ("MW") for breach of contract.  Specifically,

Starbrands alleges MW breached its contract with Starbrands when it failed to indemnify

Starbrands for losses suffered as a result of MW's gross negligence.  Both parties have moved

for summary judgment.  Dkt. Nos. 98, 102.  For the reasons set forth below, the Court

recommends that the District Judge assigned to this case deny Starbrands' motion and grant

MW's motion.[1]

## I.   PROCEDURAL HISTORY

Starbrands filed the instant action on May 23, 2014.  Dkt. No. 1.  In its Amended

_____
[1] The District Court referred this case to the undersigned for full pretrial proceedings and a report
and recommendation on any dispositive motions on October 14, 2014.  Dkt. No. 32.

Complaint, Starbrands alleged a violation of Article 4A of the Massachusetts Uniform Commercial Code ("UCC"), breach of contract, and negligence.  Dkt. No. 20 ("Amended Complaint" or "Am. Compl.").  On September 11, 2015, Judge Burroughs adopted this Court's recommendation and dismissed Starbrands' UCC and negligence claims.  Dkt. No. 49.  On October 9, 2015, MW filed a second motion to dismiss.  Dkt. No. 54.  On March 9, 2016, Judge Burroughs adopted this Court's recommendation that the motion be denied.  Dkt. No. 90.

The parties filed cross motions for summary judgment on May 9, 2016.  Dkt. Nos. 98, 102.  Starbrands and MW filed their respective oppositions on June 9, 2016 and reply briefs on June 23, 2016.  Dkt. Nos. 106, 109, 112, 113.  The Court heard oral argument on October 26, 2016.

## II.    FACTS[2]

### A.    Relevant Parties

At all times relevant to this action, MW was an independent sales organization for First Data Merchant Services Corporation ("First Data").[3]  As an independent sales organization, MW acquired and entered into contracts whereby First Data would provide credit card payment processing services.[4]  MW's role, in relevant part, was to obtain merchants, have them fill out paperwork, and send the information to First Data for ultimate approval.[5]

Starbrands Capital LLC and Starbrands Norcal MSO, LLC are limited liability companies

---

[2] The facts are undisputed unless otherwise noted.  The facts are derived from Starbrands' statement of undisputed material facts and MW's responses therein (Dkt. No. 107) ("Starbrands SOF") and MW's statements of material facts and Starbrands' responses therein (Dkt. No. 110) ("MW SOF").

[3] MW SOF ¶ 1.

[4] Id. ¶ 2.

[5] Id. ¶ 3.

that are owned by Omar Salah, and share a business address with Salah's personal residence in Los Angeles, California.[6]  Starbrands registered "Norcal Healthcare Services"[7] with the Alameda County recorder's office and was doing business under that name between December 22, 2009 and December 22, 2014.[8]

Norcal Health Care, Inc. ("NHCI") operates medical clinics throughout the state of California.[9]  Dr. Michael Caplan began working at the NHCI clinics in or around November-December 2009, and assumed ownership of NHCI from its former owner, Dr. Philip A. Denney, in or around April-June 2010.[10]

The Library, Inc. is an accounting firm that serviced the clinics, Starbrands, and Salah, individually.[11]  Library employee Ariadne Shaffer served as Salah's financial manager and Alexis Garcia served as Shaffer's assistant.[12]  Starbrands' counsel described Shaffer as a "c-level executive of Starbrands" who "managed its financial affairs and oversaw execution of its

---

[6] Id. ¶¶ 4-7.  The relationship between Starbrands Capital and Starbrands Norcal MSO is unclear. At oral argument, plaintiff's counsel stated that the only connection between the two companies is that they are both owned by Omar Saleh.  However, at his deposition, Salah testified that he "did not know the exact difference between Starbrands Capital and Starbrands Norcal MSO" and that he assumed "one was owned by the other."  MW SOF ¶ 8.  Accordingly, unless otherwise indicated, the Court adopts the parties' practice of using "Starbrands" to collectively refer to both entities.  Dkt. No. 106 at 6; see generally Dkt. No. 103.

[7] According to records from the Alameda county clerk's office, Starbrands registered the business name "NORCAL HEALTHCARE SERVICES."  Dkt. No. 103-6.  The parties, however, refer to this entity as both "Norcal Healthcare Services," see Starbrands SOF ¶ 2, and "Norcal Health Care Services."  See Dkt. No. 99 at 9, Dkt. No. 106 at 4.  For purposes of consistency, this Court will use the name "Norcal Healthcare Services."

[8] Starbrands SOF ¶ 2.

[9] MW SOF ¶ 11.

[10] Id. ¶¶ 13-15.  Starbrands denies that Dr. Caplan assumed ownership of NHCI from Dr. Denney.  Id. ¶ 15.

[11] Id. ¶ 17.

[12] Id. ¶ 18.

payment systems" and was "directly involved in every facet of its financial affairs."[13]

### B. Starbrands And NHCI: The ARMSA

On December 1, 2010 (effective May 1, 2010), NHCI and Starbrands Norcal MSO

entered into an Amended and Restated Management Services Agreement ("ARMSA").[14] See

Dkt. No. 100-12. Salah signed the ARMSA.[15] The ARMSA contains the following provisions:

- [NHCI] retains [Starbrands] to provide all of the management and related services identified or referenced in Article 3 and as otherwise required by [NHCI], subject to the requirements of the applicable provisions of California law relating to the practice of medicine; and [Starbrands] accepts such retention and will provide the Management Services. (ARMSA § 1.1).

- [Starbrands] and [NHCI] intend to act and perform as independent contractors, and this Agreement is not intended to create any partnership, joint venture, or employment relationship between the parties. (ARMSA § 1.3).

- All monies collected for [NHCI] by [Starbrands], and all other funds which may be received by [NHCI] in exchange for the provision of professional services, shall be deposited into a bank account that is in [NHCI's] name and is controlled exclusively by [NHCI]. . . . [NHCI] shall arrange for the Bank to sweep the [NHCI Account] on a daily basis of all funds in the account, and deposit such funds into another bank account that is in [NHCI's] name and on which both [NHCI] and [Starbrands] are signatories. (ARMSA § 3.4(e)).

- All collections for services rendered to patients by the Practice shall be made under [NHCI's] name, and [Starbrands] shall act as [NHCI's] agent in the collection of such amounts. (ARMSA § 3.5).

- [Starbrands] shall receive as compensation for the performance of all of its obligations and duties contained in the Agreement a Management Fee in an amount equal to [$50,000] per month. . . . [NHCI and Starbrands acknowledge that the Management Fee may be adjusted by the parties from time to time in the event [NHCI] experiences a change in revenues or expenses. . . . (ARMSA § 5.1(a)).

- This Agreement, together with all exhibits and schedules hereto, and all

---

[13] Id. ¶ 18.

[14] Id. ¶ 19. The Court notes that the plaintiff in this case, Starbrands Capital LLC, was not a signatory to this agreement. Rather, the agreement was signed by Omar Salah, in his capacity as manager of Starbrands Norcal MSO, LLC. See Dkt. No. 100-12 at 29. At oral argument, MW stated that for purposes of summary judgment, it was not challenging whether the plaintiff in this case has standing to bring a suit arising out of an agreement signed by Starbrands Norcal MSO.

[15] MW SOF ¶ 20.

> documents referred to herein, constitutes the entire agreement between the parties with respect to the subject matter hereof, supersedes all other and prior agreements on the same subject, whether written or oral, and contains all of the covenants and agreements between the parties with respect to the subject matter hereof. Each party to this Agreement acknowledges that no representations, inducements, promises, or agreements, orally or otherwise, have been made by the other party(ies), or by anyone acting on behalf of any party, that are not embodied herein, and that no other agreement, statement, or promise not contained in this Agreement shall be valid or binding. (ARMSA § 13.2).

See Dkt. No. 100-12. The ARMSA also provided that NHCI could pay Starbrands a bonus in addition to the management fee.[16]

On December 1, 2010 (effective May 1, 2010), NHCI and Starbrands Norcal MSO entered into a modification to the ARMSA, which reduced the management fee to $20,000 per month.[17] See Dkt. No. 100-14 ("ARMSA Modification"). Salah also signed the ARMSA Modification.[18] Starbrands received $265,000 in management fees and approximately $95,710 in bonuses between December 2010 and October 2012.[19]

## C. Starbrands And MW: The Merchant Account

On or about January 11, 2010, MW received a Merchant Processing Application and Agreement on behalf of "NorCal Health Care Services."[20] See Dkt. No. 100-16 ("Merchant Application"). The Merchant Application lists Salah as the contact name and owner, and his name also appears on the signature block.[21] In addition, the application contains the contact e-mail address "Christina@Star-Brands.com," which belongs to Christina Preda, Salah's "number

---

[16] MW SOF ¶ 27.

[17] Id. ¶ 28.

[18] MW SOF ¶ 29. Salah testified at his deposition that he signed the ARMSA Modification under duress. Id. ¶¶ 32-33.

[19] Id. ¶ 31.

[20] Starbrands SOF ¶ 1; MW SOF ¶ 34.

[21] Starbrands SOF ¶ 3.

two" employee.[22]  Finally, the Merchant Application lists Starbrands' unique tax identification number ending in 2092 and designates a Chase Bank account ending in 0987 ("Chase Account") as the settlement bank account.[23]

Preda prepared and signed the Merchant Application on behalf of Salah, who testified that he did not review, prepare, or sign it.[24]  Salah also testified that it was within Preda's purview to set up the account and that he instructed Preda to "take care of all th[e] business" associated with the account.[25]

The Merchant Application incorporates a Merchant Services Program Guide.[26]  See Dkt. No. 100-17 ("Program Guide").  The Program Guide contains an indemnification clause wherein MW agreed to indemnify Starbrands for certain losses.  Specifically, the indemnification clause states:

> We agree to indemnify and hold you harmless from and against all losses, liabilities, damages and expenses resulting from any breach of any warranty, covenant or agreement or any misrepresentation by us under this Agreement or arising out of our or our employees' gross negligence or willful misconduct in connection with this Agreement. (Program Guide § 26.2).

Dkt. No. 100-17 at 19.[27]  The Program Guide also provides, in relevant part:

> If you believe any adjustments should be made with respect to your Settlement Account, you must notify us in writing within 45 days after any debit or credit is or should have been effected.  If you notify us after such time period, we may, in our discretion, assist you, at your expense, in investigating whether any adjustments are appropriate and whether any amounts are due to or from other

---

[22] Id.; MW SOF ¶ 38.

[23] Starbrands SOF ¶ 5; MW SOF ¶ 42.  Salah had online access to the Chase Account. MW SOF ¶ 43.

[24] Starbrands SOF ¶¶ 3-4; MW SOF ¶¶ 37, 41.

[25] MW SOF ¶¶ 39-40.

[26] Starbrands SOF ¶ 14; MW SOF ¶ 35.

[27] When referring to the parties' pleadings and exhibits, the Court cites to the docket (ECF) page numbers rather than the page numbers in the original documents.

> parties, but we shall not have any obligation to investigate or effect any such
> adjustments.  Any voluntary efforts by us to assist you in investigating such
> matters shall not create any obligation to continue such investigation or any future
> investigation.  (Program Guide § 18.10).

Dkt. No. 100-17 at 16.

After receiving the Merchant Application, MW opened a merchant account and assigned

it an ID number of 535353120140686 ("Merchant Account").[28]

### D.    Merchant Account Change Requests

#### 1.    The March 15, 2010 Change Request

On February 18, 2010, Shaffer, Preda, and Salah exchanged emails in which Shaffer

stated that "[a]ll income is supposed to go into the Dr. Denney Account and then be transferred

into the Norcal Healthcare account on a regular basis. . . . we need to start the process of moving

all the credit card terminals over to the Dr. Denney account as well."[29]  In or around March 13,

2010, Dr. Denney set up the Bank of the West Account.[30]  Upon doing so, Dr. Denney emailed

Salah on March 13, 2010 and informed him about the account, which had been opened under

NHCI, and of his intention to "transfer the funds from Chase and close the account when

appropriate."[31]  See Dkt. No. 100-20 at 4.

On or about March 15, 2010, Preda submitted a FACS FDMS ABA/DDA Change

Request to MW.[32]  See Dkt. No. 100-19 ("March 15 Change Request").  The March 15 Change

Request was signed by Preda, who is identified as "Chief of Staff" of Norcal Healthcare

---

[28] MW SOF ¶ 36.

[29] Id. ¶¶ 65-67.

[30] Id. ¶ 47.  Later, Dr. Denney made Dr. Caplan a signatory on the account.  Id. ¶ 63.

[31] Id. ¶ 69.

[32] MW SOF ¶ 44.

Services, and designates a Bank of the West account ending in 6826 ("Bank of the West Account") as the settlement bank account.[33]  The March 15 Change Request includes a voided check for the Bank of the West Account and identifies NHCI as the account holder at the bank.[34]  MW processed the March 15 Change Request and confirmed that the bank change was set on March 18, 2010.[35]

### 2.      The June 3, 2010 Change Request

On or around June 3, 2010, MW received a second change request signed by Dr. Caplan and listing NHCI as the merchant name.[36]  See Dkt. No. 100-22 ("June 3 Change Request"). The June 3 Change Request designated the settlement bank account as a Morgan Stanley account ending in 0979 ("Morgan Stanley Account") that belonged to NHCI.[37]  An attached letter listed Shaffer, Salah's financial manager, as the client contact.[38]  MW asserts that the June 3 Change Request was never effectuated.[39]

### 3.      The June 22, 2010 Change Request

On or around June 22, 2010, MW received a third change request in connection with the Merchant Account.[40]  See Dkt. No. 100-24 ("June 22 Change Request").  The June 22 Change Request lists the merchant as NHCI and Dr. Caplan as the "owner."[41]  The Bank of the West

---

[33] MW SOF ¶¶ 45-46.

[34] Id. ¶ 49.

[35] Id. ¶ 50.

[36] Id. ¶¶ 51-52.

[37] MW SOF ¶¶ 53-54.

[38] Id. ¶ 54.

[39] Id. ¶ 55.

[40] Id. ¶ 57.

[41] MW SOF ¶ 58.

Account (previously identified in the March 15 Change Request) was listed as the settlement account.[42]  The June 22 Change Request also included a voided check for the Bank of the West account, which identified the account holder as NHCI.[43]  None of the following appear on the June 22 Change Request: Salah's name and/or signature, Starbrands' tax identification number, or Norcal Healthcare Services.[44]

On June 24, 2010, MW employee Lilit Zakaryan emailed Salah's accounting firm to confirm that she received the June 22, 2010 bank change form.[45]  On June 29, 2010, Shaffer's assistant inquired as to the status of the switch and Zakaryan confirmed that "the bank change ha[d] been completed."[46]  On July 1, 2010, Zakaryan informed Salah's accounting firm that the funds would be deposited into the Bank of the West Account by July 2.[47]  On July 1, 2010, Garcia responded that they had received the "Amex Deposits."[48]  Salah testified that he knew as of July 2010 that no credit card revenue from the clinics was being deposited into the Chase Account.[49]

From on or about March 18, 2010 through October 2012 (when the Merchant Account was closed), all patient revenue generated from credit card payments at the clinics serviced by MW was deposited into the Bank of the West Account.[50]  The Bank of the West Account served

---

[42] Starbrands SOF ¶ 6; MW SOF ¶ 59.

[43] Starbrands SOF ¶ 10; MW SOF ¶ 60.

[44] Starbrands SOF ¶¶ 7-9.

[45] MW SOF ¶ 78.

[46] Id. ¶ 81.

[47] Id. ¶ 79.

[48] Id.

[49] Id. ¶ 71.

[50] Id. ¶ 61.

as the general account for the clinics and was used to pay clinic expenses, payroll, and management fees under the ARMSA.[51]

On November 23, 2010, Salah's accountants informed him that payroll was being paid out of the Chase Account and that funds were sent to the account from the Bank of the West Account when they were authorized by Dr. Caplan.[52]  On November 21, 2011, Salah's accountants informed him that the Chase account was an "old account" that was no longer in use and Saleh responded that he would close the bank account himself.[53]

Salah did not contact MW about any discrepancy in the Chase Account until on or about August 6, 2012.[54]  Throughout August and September 2012, Salah sought a full reversal of funds he claimed were not deposited into his Chase Account.[55]  MW explained to Salah that no reversals would be issued because the funds were deposited into the Bank of the West Account and that Salah would have to seek the missing funds directly from the holder of that account.[56]  MW also stated that there would be no reversals because of an earlier bank change submitted by Preda.[57]  Finally, MW alleges that it investigated Salah's concerns about the Merchant Account, and that as part of that investigation, it contacted Chase Bank and Dr. Caplan and reviewed NHCI accounts at MW as well as the timeline regarding when the change request forms were received.[58]

---

[51] Id. ¶ 62.

[52] Id. ¶ 70.

[53] Id. ¶ 74.

[54] Id. ¶¶ 76, 97.

[55] Id. ¶ 99.

[56] Id. ¶ 101.

[57] Id. ¶ 102.

[58] See id. ¶¶ 103-108.

E.       **The California Action**

In April 2012, Dr. Caplan and NHCI sued Starbrands Norcal MSO, Salah, and others, in

an action captioned Norcal Health Care, Inc. et al. v. Starbrands Norcal, MSO, LLC, et al., No.

RG-12623651 (Super. Ct. Cal., Alameda County).[59]  See Dkt. No. 100-30 ("California Action").

In that action, Dr. Caplan and NHCI alleged that Starbrands Norcal MSO and Salah breached the

ARMSA by interfering in both the business activities and the provision of medical care by

NHCI.[60]  The plaintiffs in the California Action sought a declaratory judgment that NHCI

properly terminated the ARMSA, for cause, in February 2012.[61]  In response, Starbrands Norcal

MSO filed a cross-complaint alleging, inter alia, that Dr. Caplan unlawfully excluded Starbrands

from the clinics and breached the ARMSA and the ARMSA Modification by changing the

account holder's name from Starbrands to NHCI and by diverting funds from Starbrands for two

years.[62]

After the court in the California Action entered a default judgment against the defendants,

it held a prove-up hearing in which Dr. Caplan and NHCI appeared, presented evidence, and

rested.[63]  On March 26, 2015, the California court entered a judgment in favor of NHCI and

against Starbrands Norcal MSO on the breach of contract claim and issued a declaration that the

ARMSA was properly terminated by NHCI for cause.[64]  Effective August 7, 2012, the California

court issued a temporary restraining order which prohibited Starbrands or Salah from, inter alia,

---

[59] Id. ¶ 83.

[60] MW SOF ¶ 84.

[61] Id. ¶ 85.

[62] Id. ¶¶ 86-88.

[63] Id. ¶¶ 90-91.

[64] Id. ¶¶ 92-93.  Starbrands does not dispute that the California Judgment is final for purposes of issue preclusion.  Id. ¶ 94.

(1) entering onto the premises of any of the clinics; (2) asserting any interest in, ownership of, or control over any clinic operated by NHCI; and (3) interfering, or seeking to interfere with the normal business operations of NHCI, including communicating with its patients, employees, contractors, or vendors.[65]

## III.    STANDARD OF REVIEW

Summary judgment is appropriate when the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A 'genuine' issue is one that could be resolved in favor of either party, and a 'material fact' is one that has the potential of affecting the outcome of the case."  Dennis v. Osram Sylvania, Inc., 549 F.3d 851, 855 (1st Cir. 2008) (quoting Calero-Cerezo v. United States Dep't. of Justice, 355 F.3d 6, 19 (1st Cir. 2004)).

The Court "must scrutinize the evidence in the light most agreeable to the nonmovants, who are entitled to the benefit of all reasonable inferences therefrom."  Ahern v. Shinseki, 629 F.3d 49, 53-54 (1st Cir. 2010) (citing Cox v. Hainey, 391 F.3d 25, 29 (1st Cir. 2004)).  "A properly supported summary judgment motion cannot be defeated by relying upon conclusory allegations, improbable inferences, acrimonious invective, or rank speculation."  Id. (citations omitted).

"Cross motions for summary judgment neither alter the basic Rule 56 standard, nor warrant the grant of summary judgment per se."  Wightman v. Springfield Terminal Ry. Co., 100 F.3d 228, 230 (1st Cir. 1996).  "Cross motions simply require us to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed."  Id.  "Where, as here, a district court rules simultaneously on cross-motions for summary judgment, it must view

---

[65] Id. ¶¶ 93, 98.

each motion, separately, through this prism."  Estate of Hevia v. Portrio Corp., 602 F.3d 34, 40

(1st Cir. 2010) (citing Blackie v. Maine, 75 F.3d 716, 721 (1st Cir. 1996) ("Barring special

circumstances, the nisi prius court must consider each motion separately, drawing inferences

against each movant in turn.")).

## IV.   DISCUSSION

MW moves for summary judgment with respect to the entire case.  Dkt. No. 98. At oral

argument, Starbrands confirmed that it moves for partial summary judgment on liability only.

### A.   Breach Of Contract

Starbrands claims that MW breached its contract—specifically, the Program Guide—

when it declined to indemnify Starbrands for losses that allegedly arose out of MW's gross

negligence.  Dkt. No. 103 at 3.  Starbrands further alleges that MW's actions rose to the level of

gross negligence when it allowed certain unauthorized bank change requests, and when it refused

to reverse the deposits and declined to indemnify Starbrands for losses that resulted from those

requests.  Id. at 6-12.  Finally, Starbrands contends that MW was grossly negligent when it

submitted a 1099K tax form falsely indicating that it had transmitted sums of money to

Starbrands.  Id. at 9-10.

In order to prove a breach of contract claim, the plaintiff must prove that "a valid, binding

contract existed, the defendant breached the terms of the contract, and the plaintiff[ ] sustained

damages as a result of the breach."  Brooks v. AIG SunAmerica Life Assurance Co., 480 F.3d

579, 586 (1st Cir. 2007) (citation omitted).  Under Massachusetts law,[66] indemnity clauses "are

to be fairly and reasonably construed in order to ascertain the intention of the parties and to

---

[66] The parties do not dispute that Massachusetts law applies.  In addition, Section 31.1 of the
Program Guide contains a choice of law provision stating that the Agreement is governed by the
laws of Massachusetts.  See Dkt. No. 100-17 at 21.

effectuate the purpose sought to be accomplished." <u>Farmers Ins. Exchange v. RNK, Inc.</u>, 632

F.3d 777, 786 (1st Cir. 2011). "It is well accepted . . . that indemnification provisions are

construed in accordance with their ordinary and plain meaning and without any bias in favor of

the indemnitor or against the indemnitee." <u>Caldwell Tanks, Inc. v. Haley & Ward, Inc.</u>, 471 F.3d

210, 217 (1st Cir. 2006).

The indemnity clause in the Program Guide states that:

> [MW] agree[s] to indemnify and hold [Starbrands] harmless from and against all
> losses, liabilities, damages and expenses resulting from any breach of any
> warranty, covenant or agreement or any misrepresentation by [MW] under this
> Agreement or arising out of [MW's] or [MW's] employees' **gross negligence** or
> willful misconduct in connection with this Agreement.  (Program Guide § 26.2).

Dkt. No. 100-17 at 19 (emphasis added).  Accordingly, in order to prove that MW breached

Section 26.2 of the Program Guide, Starbrands must establish that its losses were caused by

MW's gross negligence.

**B.     Gross Negligence**

The long-standing definition of gross negligence in Massachusetts is set forth in <u>Altman</u>

<u>v. Aronson</u>, 231 Mass. 588, 591-92 (1919); <u>see</u> <u>Aleo v. SLB Toys USA, Inc.</u>, 466 Mass. 398,

410 (2013).  <u>Altman</u> states:

> Gross negligence is substantially and appreciably higher in magnitude than
> ordinary negligence.  It is materially more want of care than constitutes simple
> inadvertence.  It is an act or omission respecting legal duty of an aggravated
> character as distinguished from a mere failure to exercise ordinary care.  It is very
> great negligence, or the absence of slight diligence, or the want of even scant care.
> It amounts to indifference to present legal duty and to utter forgetfulness of legal
> obligations so far as other persons may be affected.  It is a heedless and palpable
> violation of legal duty respecting the rights of others.  The element of culpability
> which characterizes all negligence is in gross negligence magnified to a high
> degree as compared with that present in ordinary negligence.  Gross negligence is
> a manifestly smaller amount of watchfulness and circumspection than the
> circumstances require of a person of ordinary prudence.

231 Mass. at 591.  Gross negligence, however, falls short of being such reckless disregard of probable consequences as is equivalent to a willful and intentional wrong.  Id.

Causation is an essential element to demonstrate gross negligence.  Doe v. Cultural Care, Inc., C.A. No. 10-11426-DJC, 2011 WL 4738558, at *4 (D. Mass. Oct. 7, 2011) (citing Nna v. Am. Standard, Inc., 630 F. Supp. 2d 115, 132 n. 21 (D. Mass. 2009)).  Under Massachusetts law, a plaintiff must show not only that the defendant's negligent conduct was the cause-in-fact of the plaintiff's injury, but also that the conduct was the proximate or legal cause of the injury.  Id. (citing Staelens v. Dobert, 318 F.3d 77, 79 (1st Cir. 2003)).  To demonstrate proximate cause, a plaintiff must show that his or her injuries were within the reasonably foreseeable risks of harm created by the defendant's negligent conduct, although the precise harm need not be foreseeable.  Id.

In evaluating whether a defendant's actions were grossly negligent, a court must consider the defendant's conduct as a whole, assessing every act or omission in connection with all the other circumstances.  See id. at *3 (citing Driscoll v. Pagano, 313 Mass. 464, 468 (1943)).  Thus, the question of whether a party's conduct was grossly negligent involves a fact-based inquiry into the circumstances of the case.  Szulik v. State Street Bank & Trust Co., 935 F. Supp. 2d 240, 269 (D. Mass. 2013).  Although the question of whether a risk of harm was reasonably foreseeable is ordinarily a matter for the jury, summary judgment may be appropriate when the evidence and the reasonable inferences drawn therefrom lead to but one conclusion.  Doe, 2011 WL 4738558, at *4 (citations omitted).

1.      The Change Requests Processed By MW

The undisputed facts show that MW's decision to process the bank change requests does not meet the heightened burden necessary to prove gross negligence.  In support of its claim that

MW's conduct rose to the level of gross negligence, Starbrands argues "that the Bank Change Request had *none* of the usual indicia of authenticity and legitimacy" because the company name, the name of the authorized signor, the signatures, and the tax ID numbers did not match the information on the original Merchant Application.[67]  Dkt. No. 103 at 7-8 (emphasis in original).  Starbrands ignores, however, the context within which MW accepted the change requests.

The circumstances of the March 15 Change Request do not indicate that MW was grossly negligent.  Before receiving the June 22 Change Request, MW received the March 15 Change Request.  The March 15 Change Request directed MW to move the settlement bank account to an account at the Bank of the West.  MW SOF ¶ 46.  Although NHCI, and not Norcal Healthcare Services, was listed as the account holder for the Bank of the West Account, Norcal Healthcare Services was still listed as the merchant name.  Id. ¶¶ 45, 49.  In addition, the March 15 Change Request was signed by Preda—the same person who filed the original Merchant Application.  Id.

---

[67] Notably, Starbrands refers to a single bank change request and makes this argument by comparing the original Merchant Application with the June 22 Change Request.  See Dkt. Nos. 103 at 7, 109 at 10-12.  Accordingly, Starbrands does not appear to challenge the March 15 or June 3 Change Requests.  However, at oral argument, Starbrands stated that its gross negligence claim is also premised on MW's execution of these other requests.  Starbrands has not provided any specific argument, in either its summary judgment papers or otherwise, with respect to how MW's granting of these additional requests amounts to gross negligence.  For this reason, this argument is deemed waived for purposes of the instant motion.  See Redondo-Borges v. United States Dep't of Housing & Urban Dev., 421 F.3d 1, 6 (1st Cir. 2005) (citation omitted) ("Few principles are more sacrosanct in this circuit than the principle that 'issues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'").  Moreover, even assuming, arguendo, that Starbrands had not waived this argument, MW's execution of the requests does not amount to gross negligence.  Specifically, the Court finds that there can be no gross negligence with respect to the June 3 Change Request because it was never effectuated by MW.  See MW SOF ¶ 55.  With respect to the March 15 Change Request, the Court addresses its findings in more detail herein.

¶¶ 37, 44.  Finally, MW processed the March 15 Change Request and confirmed that the change was "all set" on March 18, 2010.  Id. ¶ 50.

By the time MW received the June 22 Change Request—which instructed MW to deposit funds into the same Bank of the West Account held by the same account holder (NHCI) as the March 15 Change Request—the change request had no practical effect on the movement of funds, which were already being deposited into that account.  Id. ¶¶ 59-60.  The June 22 Change Request did contain information that was different from the Merchant Application in that it listed the account owner as Caplan and the merchant name as NHCI.  However, these discrepancies do not transform MW's conduct into gross negligence, particularly where MW was in contact with Salah's employees and accountants regarding the bank changes, and Salah's accounting firm confirmed that the funds were being deposited into the Bank of the West Account and offered no objection to the change requests.  Id. ¶¶ 50, 78-81; see also Dkt. No. 100-21 at 4-5.

Finally, Starbrands further attempts to demonstrate MW's gross negligence by arguing that "MW disregarded its own protocols and industry standard[s] in authorizing an obviously bogus Bank Change Request."  Dkt. No. 103 at 8.  In support of this claim, Starbrands cites the testimony of Tia McConnell, Team Lead at MW, who testified that she "wouldn't have submitted the [bank change] paperwork."  Id.  Starbrands, however, fails to provide this Court with any further argument or evidence regarding MW's protocols or the industry standards associated with bank change requests and/or credit card payment processing services.  As a result, there is no evidence in the record from which this Court could analyze MW's compliance with such protocols and standards.

After carefully analyzing the undisputed facts in the record, the Court finds that even when construing these facts in the light most favorable to Starbrands, there is no evidence of a

heedless and palpable violation of legal duty by MW.  Accordingly, the Court finds that MW's

processing of the bank change requests does not rise to the level of conduct required to prove a

claim of gross negligence.

2.      MW's Failure To Indemnify Starbrands

Starbrands also argues that MW's refusal to indemnify amounts to gross negligence.

MW, however, contends that Starbrands waived its right to enforce the Program Guide's

indemnification provision when it failed to comply with Section 18.10 of the contract.  Dkt. No.

99 at 23-24.  Starbrands counters that Section 18.10 only pertains to the amount of fees owed by

a merchant to MW.  Dkt. No. 109 at 18-19.  This Court disagrees.

Section 18.10 of the Program Guide, which is titled "Fees; Adjustments; Collections of

Amounts Due" provides as follows:

> If [Starbrands] believe[s] any adjustments should be made with respect to [its]
> Settlement Account, [it] must notify [MW] in writing within 45 days after any
> debit or credit is or should have been effected.  If [Starbrands] notif[ies] [MW]
> after such time period, [MW] may, in [its] discretion, assist [Starbrands], at [its]
> expense, in investigating whether any adjustments are appropriate and whether
> any amounts are due to or from other parties, but [MW] shall not have any
> obligation to investigate or effect any such adjustments.  Any voluntary efforts by
> [MW] to assist [Starbrands] in investigating such matters shall not create any
> obligation to continue such investigation or any future investigation.

Dkt. No. 100-17 at § 18.10.

A court interpreting a contract must assess whether the contract is ambiguous by

examining the language of the contract by itself, independent of extrinsic evidence concerning

the drafting history or the intention of the parties.  Szulik, 935 F. Supp. 2d at 255 (citing Nicolaci

v. Anapol, 387 F.3d 21, 26 (1st Cir. 2004)).  A contract is only ambiguous where an agreement's

terms are inconsistent on their face or where the phraseology can support reasonable differences

of opinion as to the meaning of the words employed and obligations undertaken.  Id. (citations

omitted).  Should the court find the contract language unambiguous, it must interpret it according

to its plain terms.  Id. (citations omitted).  The meaning of an unambiguous contract term is a

question of law, while the meaning of an ambiguous contract term is a question of fact.  Id.

This Court finds that the relevant sections of the Program Guide are unambiguous.  First,

Section 18.10 states that Starbrands was obligated to address any adjustments it believed needed

to be made to its settlement account within 45 days after any debit or credit should have been

effected.  See Dkt. No. 100-17 at 16.  The Program Guide defines a settlement account as "an

account at a financial institution designated by Client as the account to be debited and credited . .

. for Card transactions, fees, Chargebacks and other amounts due under the Agreement . . . ."  Id.

at 23.  Accordingly, the provisions of Section 18.10, including reference to the settlement

account, do not, as Starbrands argues, only refer to "fees charged by MW," see Dkt. No. 109 at

18, but also include amounts debited and credited for card transactions, such as the amounts at

issue here.

It is undisputed that neither Starbrands nor Salah contacted MW within 45 days to report

that adjustments to the settlement account were required.  MW SOF ¶ 76.  In fact, despite

admitting that he was aware in July 2010 that there was no credit card revenue being deposited

into his Chase Account, Salah did not contact MW until more than two years later.[68]  Id. ¶¶ 71-

---

[68] Starbrands argues that Salah gave MW notice "as soon as he had learned about the method by
which his account had been compromised."  Dkt. No. 109 at 19.  This argument fails.  In support
of this statement, Starbrands points to paragraph 56 of its Amended Complaint, in which it
alleges that in June 2012, Salah was notified by one of Dr. Caplan's former employees that
Caplan "had taken over the existing merchant account at MW."  Dkt. No. 20-3.  However, an
unsupported allegation in a complaint is not an appropriate means of creating a material dispute
of fact for purposes of summary judgment.  See e.g., Fed. R. Civ. P. 56(c); see also Felix v.
Lugas, C.A. No. 00-122250-DPW, 2004 WL 1775996, at *1 n.5 (D. Mass. March 2, 2004) (an
unverified complaint does not form part of the summary judgment record).  In addition, it
ignores the communications with his employees and accountants.  See MW SOF ¶¶ 39-40, 65-
67, 69-72.

72, 74-77.  Moreover, MW confirmed the settlement account change with Salah's accountants in 2010 and, for the next two years, had no way of knowing Starbrands believed that the credit being deposited into that account was improper.  Accordingly, given that Starbrands did not comply with its obligations under the Program Guide and that MW had no reasonable means of knowing that Starbrands believed its account was owed outstanding funds, MW's refusal to indemnify Starbrands does not amount to gross negligence.

For the reasons stated above, this Court finds that MW was neither grossly negligent in processing the bank change requests nor grossly negligent in failing to indemnify Starbrands after-the-fact.[69]

### C.      No Injury To Starbrands

MW also moves for summary judgment on the basis that there has been no breach of the ARMSA.  Dkt. No. 99 at 14-19.  Specifically, MW contends that pursuant to the ARMSA, revenue from the clinics did not belong in Starbrands' Chase Account, and therefore, MW did not breach the contract and Starbrands was not injured when MW failed to deposit revenue into that account.  See id.  Starbrands does not argue that the clinic revenue should have been distributed into the Chase Account pursuant to the ARMSA; rather, Starbrands claims that there is a genuine issue of material fact as to whether the ARMSA is enforceable as a result of unlawful coercion.  Dkt. No. 109 at 19-20.

---

[69] Starbrands also argues that MW was grossly negligent when it issued and delivered a 1099K tax form to the IRS which indicated that it had transmitted funds to Starbrands.  Dkt. No. 103 at 9-10; see Dkt. No. 103-3 at 3.  There are several problems with this argument.  First, Starbrands did not provide any statements of fact on this issue, and second, there appears to be a dispute of fact with respect to whether the tax form was even generated by MW.  See Starbrands SOF ¶ 13. Accordingly, Starbrands has not met its burden and the Court finds that this argument is an insufficient basis to grant Starbrands' motion for partial summary judgment.

Section 3.4(e) of the ARMSA states, in relevant part:

> All monies collected for [NHCI] by [Starbrands], and all other funds which may
> be received by [NHCI] in exchange for the provision of professional services,
> shall be deposited into a bank account that is in [NHCI's] name and is controlled
> exclusively by [NHCI].

Dkt. No. 100-12 at 10.

Starbrands argues that it "has alleged sufficient facts to support a finding of unlawful coercion." Dkt. No. 109 at 19. Starbrands, however, has failed to put before this Court any statement of material fact in support of its argument that Salah was under duress when he signed the ARMSA. The only factual statements before this Court evidencing Salah's duress claim pertain to (1) his signing of the ARMSA Modification (which is distinct from the ARMSA) and (2) affirmative defenses made to a California court. MW SOF ¶¶ 32-33, 89. Accordingly, Starbrands has not established, or even put into question in the instant action, the issue of whether Salah was under duress when he signed the ARMSA.

Indeed, the record shows that Salah is a sophisticated business man who was represented by counsel while negotiating the terms of the ARMSA. Id. ¶¶ 9-10, 20, 22-23. Moreover, Starbrands has, at times, argued for the enforceability of the ARMSA. For example, Starbrands asks this Court to recognize that it was "entitled" to certain provisions provided to it under the ARMSA (see Dkt. No. 109 at 6-7) and admits that Starbrands Norcal MSO received approximately $95,710 in bonuses between December 2010 and October 2012, which appear to have been made pursuant to Section 5.1(b) of the ARMSA (see Dkt. No. 100-15; see also ARMSA § 5.1(b)). Accordingly, there is no basis for this Court to find that there exists a genuine dispute of material fact as to the enforceability of the ARMSA and the provisions contained therein.

In addition, because Section 3.4(e) of the ARMSA unambiguously states that all funds

were to be deposited into a bank account in NHCI's name and controlled exclusively by NHCI, the change requests at issue in this dispute caused MW to deposit funds into an account prescribed by the ARMSA.  Thus, the undisputed facts show that MW's action—depositing funds into the Bank of the West Account rather than the Chase Account—could not have been a proximate cause of any injury to Starbrands because under the ARMSA, Starbrands was not legally entitled to have the funds deposited into the Chase Account in the first place. Accordingly, this Court finds that MW has not caused any injury to Starbrands and recommends that the District Judge grant MW's motion on this basis.

## V.    CONCLUSION

For the foregoing reasons, this Court recommends that the District Judge deny Starbrands' partial motion for summary judgment and grant MW's motion for summary judgment.

## VI.    REVIEW BY DISTRICT JUDGE

The parties are hereby advised that under the provisions of Rule 72(b) of the Federal Rules of Civil Procedure, any party who objects to these proposed findings and recommendations must file specific written objections thereto with the Clerk of this Court within fourteen days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made, and the basis for such objections. See Fed. R. Civ. P. 72. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation. See Phinney v. Wentworth Douglas Hosp., 199 F.3d 1 (1st Cir. 1999); Sunview Condo. Ass'n v. Flexel Int'l, Ltd., 116 F.3d

962 (1st Cir. 1997); <u>Pagano v. Frank</u>, 983 F.2d 343 (1st Cir. 1993).

/s/ Jennifer C. Boal_____
JENNIFER C. BOAL
United States Magistrate Judge